IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ABIGAIL LAUTERS, et al., | |
| Plaintiff, | 4:24-CV-3175 |
| vs. | |
| NEBRASKA SECRETARY OF STATE, Robert B. Evnen, in his official capacity, et al., | MEMORANDUM AND ORDER |
| Defendants. | |

The plaintiffs, the pledged electors for an independent candidate for President of the United States, are suing Nebraska state elections officials for excluding their candidate from the ballot based on his Constitutional ineligibility for the office. They do not appear to dispute that their preferred candidate is ineligible to serve as President, but seek preliminary injunctive relief compelling the defendants to include their candidate on the ballot anyway. The Court will deny that motion.

## I. BACKGROUND

The plaintiffs, all residents of Nebraska, submitted forms to the Nebraska Secretary of State's office indicating their consent to serving as presidential electors for independent presidential candidate Shiva Ayyadurai. Filing 1 at 4-7. They allege that their forms were accompanied by enough valid signatures to qualify Ayyadurai for the ballot. Filing 1 at 11-12; *see* Neb. Rev. Stat. § 32-620(3)(b). They did so on August 1, 2024—the deadline to qualify for this year's general election ballot. *See* § 32-620(3)(b).

On September 10, the Secretary sent a letter to Ayyadurai's campaign informing him that his name wouldn't appear on the ballot. Filing 1 at 15-16.

Specifically, the letter indicated that the Secretary had become aware that Ayyadurai was not a natural-born citizen of the United States, and therefore was unqualified to serve as President. Filing 1 at 15; *see* U.S. Const. Art. II, § 1, ¶ 5. Accordingly, the Secretary indicated that "to protect the integrity of the election process and to avoid voter confusion," he would not certify Ayyadurai for the 2024 general election ballot. Filing 1 at 16.[1]

The plaintiffs allege that they weren't personally notified of the decision by the Secretary's office. Filing 1 at 15. It's reasonably clear from the complaint, however, that the plaintiffs became aware of the decision on September 10 or soon thereafter. *See* filing 1 at 16-19. Nonetheless, their complaint in this Court wasn't filed until September 30. *See* filing 1. And their motion for a temporary restraining order and preliminary injunction wasn't filed until October 15—over a month after they knew their candidate hadn't made the ballot. *See* filing 10.

In the meantime, the election has proceeded apace. The Secretary of State transmitted his "certification of the candidates, offices, and issues that appear on the state ballot" to county elections officials no later than September 13, 2024—50 days before the election. *See* Neb. Rev. Stat. § 32-801. The notice of election was published and posted by September 23. *See* Neb. Rev. Stat. § 32-802. Ballot drop-boxes were opened by county officials by September 27. *See*

---

[1] The Court is aware of Ayyadurai's own suit against the Attorney General and the District of Columbia Board of Elections seeking "injunctive relief directing [the Board of Elections] to place him on the ballot in the District of Columbia and directing [the Justice Department] to ensure that the states do not deny him access to the ballot nationwide." *Ayyadurai v. Garland*, No. 23-cv-2079, 2024 WL 2015287, at *1 (D.D.C. May 7, 2024). That case, however, was dismissed for lack of standing, because Ayyadurai hadn't completed the other procedural steps necessary to be placed on the ballot. *Id*. at *3. In this case, by contrast, the plaintiffs have at least alleged meeting the other procedural requirements.

Neb. Rev. Stat. § 32-950.01. And September 30—the date the plaintiffs filed their complaint—was the deadline for early voting ballots to be ready for delivery by mail. *See* Neb. Rev. Stat. § 32-808. In-person early voting began on October 7. Neb. Rev. Stat. § 32-942. In sum, while it's not inaccurate to say that November 5 is "Election Day," *see* Neb. Rev. Stat. § 32-403, it's also not inaccurate to say that as a practical matter, November 5 will be the *last* day of an election that's already begun.

## II. DISCUSSION

When deciding whether to issue a temporary restraining order or a preliminary injunction, the Court weighs the four *Dataphase* factors: (1) the probability that the movant will succeed on the merits, (2) the threat of irreparable harm to the movant, (3) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties, and (4) the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). No single factor is dispositive, and the burden is on the movant to establish the propriety of the remedy. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

### 1. PROPRIETY OF *EX PARTE* RELIEF

But while a temporary restraining order and preliminary injunction are weighed by the same substantive standards, there are additional procedural requirements for a temporary restraining order that the plaintiffs' haven't satisfied. Specifically, the Court may issue a temporary restraining order—that is, an order without written or oral notice to the adverse party or its attorney—only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; *and*
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). The plaintiffs made neither showing: They don't explain why the defendants couldn't or shouldn't be heard in opposition, and their motion simply recites that "Defendants have received the Plaintiffs' Verified Complaint and this Motion." Filing 10 at 24. They have, in other words, not met their burden of showing why *ex parte* relief is warranted.

2. P<small>ROPRIETY OF</small> I<small>NJUNCTIVE</small> R<small>ELIEF</small>

But the Court also finds the plaintiffs haven't made the substantive showing they would need to obtain injunctive relief. The Court has substantial questions about the merits of the plaintiffs' demand for a preliminary injunction, and generally about the merits of their claims.

(a) Likelihood of Success on the Merits

In deciding whether to grant a preliminary injunction, likelihood of success on the merits is the most significant factor. *Laclede Gas Co. v. St. Charles Cty.*, 713 F.3d 413, 419-20 (8th Cir. 2013). A party seeking injunctive relief need not necessarily show more than a 50 percent likelihood that it will prevail on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008). But the absence of a likelihood of success on the merits strongly suggests that preliminary

injunctive relief should be denied. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). And the Court finds little likelihood of success on the merits here.

### *(i) The Plaintiffs' Claims*

Start with the substance of the plaintiffs' claims: They assert that the defendants "arbitrarily and capriciously" excluded *them* from the ballot (not their candidate—more on that later) because the defendants "lack statutory authority that confers subject matter jurisdiction over the Nomination Papers and lack personal jurisdiction over Plaintiffs . . . since [they] were neither named in any notice or rejection as the parties being rejected off the ballot. . . ." Filing 1 at 2-3. So, they want a "declaratory judgment regarding the jurisdiction of the Defendants to take action. . . ." Filing 1 at 3.

But other legal theories wander into their allegations. They suggest they were denied due process by the Secretary's failure to notify them, as opposed to Ayyadurai, of the decision to keep him off the ballot. Filing 1 at 9. And this is a good time to explain what they mean by that, because their entire complaint is premised on the idea that *they*, not Ayyadurai, are the ones running for office.

It's well-understood that presidential elections in the United States are indirect—it's the Electoral College that casts the ballots which actually, directly elect the President. *See* U.S. Const. Art. II, § 1, ¶ 2-3. But it's also generally well-understood that modern presidential elections are about the presidential candidates, not the people forming the Electoral College. And Nebraska law reflects that distinction. It's names of the presidential and vice-presidential candidates, not their electors, that appear on Nebraska's general election ballot in a presidential election year. *See* Neb. Rev. Stat. § 32-614; § 32-620; Neb. Rev. Stat. § 32-712. Then,

>[t]he canvass of the votes for candidates for President and Vice President of the United States and the return thereof shall be a canvass and return of the votes cast for the presidential electors of the same party or group of petitioners respectively, and the certificate of such election made by the Governor shall be in accord with such return.

Neb. Rev. Stat. § 32-1038(1). In other words, the presidential candidates appear on the ballot, and the votes for those presidential candidates are tallied as votes for the electors pledged to them.

Despite that, the plaintiffs' claims seem to hinge on the idea that they're the actual candidates, they're the ones who've been kept off the ballot, and their actual pledged candidate really doesn't have anything to do with it. They assert that "the offices of President and Vice President of the United States **have never been offices filled (or voted for) by Nebraska voters at the general election**." Filing 1 at 24 (emphasis in original). They claim that the real issue in this case, then, is *their* ballot eligibility "for the federal office of 'Electors for President and Vice President of the United States.'" Filing 1 at 25. The defendants, they say, "went after the wrong person." Filing 1 at 33.

Most of that argument rests on the plaintiffs' interpretation of Nebraska law. But they do assert that by virtue of allegedly contravening state law, the Secretary has also violated "the rights guaranteed to the Plaintiffs . . . by the First and Fourteenth Amendments to the United States Constitution as enforced through 42 U.S.C. § 1983." Filing 1 at 40. Those rights are, apparently, their "ballot access rights" as candidates, petition circulators, and petition signers. Filing 1 at 40-41.

But their quixotic explanation of Nebraska law leads to a prayer for relief that anyone who's recently voted in a Nebraska presidential election may find

hard to understand. The plaintiffs ask the Court to "nullify the rejection and removal Proceeding for lack of personal jurisdiction over the 5 Elector Candidates and their nomination papers." Filing 1 at 46. And they want the Court to direct the defendants "to certify all 5 Elector Candidates for the offices of independent Electors for President and Vice President of the United States on the November 5, 2024 general election ballot." Filing 1 at 46; *see also* filing 1 at 43, 48-49.

### *(ii) Propriety of Declaratory Relief*

That mishmash of legal theories leaves the Court questioning, as a starting point, whether there's even a federal question here. The plaintiffs' claims begin with the premise that the Secretary has violated state law, and they end by praying for a declaration that the Secretary has violated state law. It's not at all obvious to the Court that gesturing towards the Constitution and 42 U.S.C. § 1983 somewhere in the middle makes a federal case out of what appears to be a disagreement about the requirements of state law.

And—to the extent that the plaintiffs' claims are presented as a declaratory judgment action—the Court is afforded greater discretion in determining whether to exercise jurisdiction than in other circumstances. *Scottsdale Ins. Co. v. Detco Industries, Inc.*, 426 F.3d 994, 999 (8th Cir. 2005); *see also Wagstaff & Cartmell, LLP v. Lewis*, 40 F.4th 830, 842 (8th Cir. 2022). The Court must consider

> (1) whether the declaratory judgment sought will serve a useful purpose in clarifying and settling the legal relations in issue; (2) whether the declaratory judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the federal proceeding; (3) the strength of the state's interest in having

>the issues raised in the federal declaratory judgment action decided in the state courts; (4) whether the issues raised in the federal action can more efficiently be resolved in the court in which the state action is pending; (5) whether permitting the federal action to go forward would result in unnecessary entanglement between the federal and state court systems, because of the presence of overlapping issues of fact or law; and (6) whether the declaratory judgment action is being used merely as a device for procedural fencing—that is, to provide another forum in a race for res judicata or to achieve a federal hearing in a case otherwise not removable.

Scottsdale Ins. Co., 426 F.3d at 998 (cleaned up); *see also* Lexington Ins. Co. v. Integrity Land Title Co., Inc., 721 F.3d 958, 968 (8th Cir. 2013). Even though there is no parallel state action of which the Court is aware, several of those factors suggest abstention may be appropriate—particularly the state's interest in having quintessentially state law questions resolved by state courts. Without determining *at this point* whether abstention is appropriate, the Court notes that the factors weighing in favor of abstention—in favor of not reaching the merits, in other words—necessarily weigh against the plaintiffs' likelihood of succeeding on the merits in this Court.

### *(iii) Constitutional Claims*

That said, there are protections for ballot access grounded in the First and Fourteenth Amendments, *see, e.g.*, Storer v. Brown, 415 U.S. 724, 729 (1974), and a state official's breach of state election law as it pertains to a presidential election can have federal constitutional implications, *see* Carson v. Simon, 978 F.3d 1051, 1061 (8th Cir. 2020). But even assuming that the

plaintiffs have pled some sort of federal constitutional claim, that claim finds little purchase in either state or federal law.

State law, as described above, doesn't really support their theory that they, and not Ayyadurai, are the candidates at issue. The *sui generis* nature of presidential candidates and the Electoral College create some complications, but the overall scheme of Neb. Rev. Stat. ch. 32 reflects practical reality about who's on the ballot and for whom people are really casting their ballots. The obvious import of § 32-1038 is that the people of Nebraska vote for presidential candidates, the board of state canvassers tallies those votes, and then converts them after the fact into tallies for the pledged electors for the prevailing presidential candidates. *See* § 32-1038(1). Simply put: Presidential electors don't appear on the ballot. That means the plaintiffs weren't removed from the ballot, because they were never on it. And that means that the relief they're seeking—to be certified for the ballot—simply doesn't make sense.

Federal law presents more roadblocks. While there are federal constitutional guarantees protecting ballot access,[2] they do not "automatically invalidate[] every substantial restriction on the right to vote or to associate." *Storer*, 415 U.S. at 729. Nor could that be the case, because

> as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. In any event, the States have evolved comprehensive, and in many

---

[2] The plaintiffs also mention "due process," but the only allegation they make that resembles a due process claim is their argument that they, not Ayyadurai, should have been the ones notified of his exclusion from the ballot. Even if they were entitled to notice, however—and that depends on their peculiar interpretation of the state statutes—then it's apparent they weren't damaged because they found out shortly thereafter anyway.

- 9 -

> respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates.

*Id.* at 730. The plaintiffs' associational rights "are not absolute and are necessarily subject to qualification if elections are to be run fairly and effectively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). And they may be restrained in service of the state's interest "in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.* at 194 (citing *Jenness v. Fortson*, 403 U.S. 431 (1971)). Nor, the Supreme Court has explained, is the state required "to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Id.* at 194-95.

And that interest has consistently supported excluding candidates from the ballot when they are indisputably ineligible for the office to which they aspire—in particular, the Ninth and Tenth Circuits have both persuasively concluded that it's appropriate to keep a presidential candidate off the ballot who definitively fails to meet the Article II qualifications to be President. *Lindsey v. Bowen*, 750 F.3d 1061 (9th Cir. 2014); *Hassan v. Colorado*, 495 F. App'x 947 (10th Cir. 2012) (Gorsuch, J.).

The Ninth Circuit reasoned that "there's no doubt that a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies." *Lindsey*, 750 F.3d at 1064 (quotation omitted) (citing *Bullock v. Carter*, 405 U.S. 134 (1972)). Including an indisputably ineligible candidate "would mean that anyone, regardless of age,

citizenship or any other constitutional ineligibility would be entitled to clutter and confuse our electoral ballot. Nothing in the First Amendment compels such an absurd result." *Id*. The Court also rejected any Equal Protection claim:

> To the extent this is an argument that state officials can't draw distinctions between candidates who are clearly ineligible to become president and those who aren't, it fails: The Constitution does not require things that are different in fact or opinion to be treated in law as though they were the same. Those who can't legally assume office, even if elected, are undeniably different from those who can. Because including ineligible candidates on the ballot could easily cause voter confusion, treating ineligible candidates differently from eligible ones is rationally related to the state's interest in maintaining the integrity of the election process.

*Id*. (quotation omitted) (citing *Plyler v. Doe,* 457 U.S. 202 (1982); *Am. Party of Tex. v. White,* 415 U.S. 767 (1974)). As succinctly summarized by then-Circuit Judge Gorsuch, "a state's legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office." *Hassan*, 495 F. App'x at 948.

That persuasive authority is obviously a problem for the plaintiffs. They respond by relying on *Trump v. Anderson*, 601 U.S. 100 (2024), which they say holds "that States cannot disqualify and deny ballot access to a candidate running for President even on constitutional grounds." Filing 1 at 35. They read that case too broadly. The Supreme Court's holding, and its reasoning, are narrowly confined to Section 3 of the Fourteenth Amendment, which bars insurrectionists from federal office. The Supreme Court explained that its

understanding of Section 3 was shaped by Section 5, which only empowered *Congress* to enforce the Fourteenth Amendment. *Id*. at 109-15. The Supreme Court also explained that permitting state enforcement of Section 3 would be implausible, because state-by-state resolution of the complex issue presented would be disruptive in a national election. *Id*. at 115-17.

But those concerns are not implicated here. And the Court assumes that the Supreme Court's decision, which diligently refers only to Section 3 enforcement, was written that way for a reason—to not cast doubt on the states' ability to reasonably enforce qualifications for office found elsewhere in the Constitution. The Court sees nothing in *Trump v. Anderson* which undermines *Lindsey*, *Hassan*, or the reasoning found in those opinions.

To summarize: The Court finds nothing in the plaintiffs' complaint to suggest they are likely to succeed on the merits of their claim that the State of Nebraska is obliged to place a presidential candidate on the ballot who is constitutionally barred from taking office.

(b) Irreparable Harm

A preliminary injunction cannot issue without a showing of irreparable harm. *Dataphase*, 640 F.2d at 114 n.9. To show a threat of irreparable harm, the movant must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Roudachevski*, 648 F.3d at 706. Stated differently, the harm "must be actual and not theoretical." *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986). Irreparable injury must be *likely* in the absence of an injunction. *Winter v. Nat. Res. Defense Council, Inc.,* 555 U.S. 7, 22 (2008).

It's the last part that's most relevant here—not whether the plaintiffs have been harmed by the Secretary's removal of their presidential candidate's name from the ballot, but whether that harm will occur *absent* injunctive relief.

- 12 -

Or, more to the point, whether that harm can be remedied by injunctive relief now. The plaintiffs didn't exactly sit on their rights here—they did sue only 20 or so days after the Secretary's decision. But they didn't precisely move with urgency either, and a lot happened in those 20 days. Ballots have now been printed, distributed, and cast.

The implication of requiring that irreparable injury be likely in the absence of an injunction is that an injunction should not issue where the allegedly-irreparable injury would occur despite the injunction. Accordingly, "[i]t is black letter law that an injunction will not issue when it would be ineffectual." *United States v. Parish of St. Bernard*, 756 F.2d 1116, 1123 (5th Cir. 1985). And here, the Court is entirely unconvinced that there's anything it could do for the plaintiffs, even if persuaded that they had a claim.

(c) Balance of Harms/Public Interest[3]

But if there *was* anything the Court could do, it would have to be something extraordinary, which presents another problem: "When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (Kavanaugh, J., concurring) (citing *Purcell v. Gonzalez,* 549 U.S. 1 (2006)). "Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Id.*[4]

---

[3] The balance-of-harms and public-interest factors merge when the government, or state officials in their official capacities, are the non-moving parties. *See Nken v. Holder,* 556 U.S. 418, 435 (2009).

[4] While *Purcell* is often framed as limiting a court's ability to change election laws, many election-related provisions have been characterized as "election rules" subject to *Purcell*, including which candidates are on the ballot. *See West v. Pa. Dep't of State*, No. 2:24-cv-1349, *slip op.* at 10 (W.D. Pa. Oct. 10, 2024).

- 13 -

The *Purcell* principle, as persuasively articulated by Justice Kavanaugh, suggests that a federal court's injunctive interference with a state's election procedures when an election is imminent may require a plaintiff to establish

> at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id.*; *cf. Carson*, 978 F.3d at 1061. Obviously, in this case, the Court is already skeptical of the merits of the plaintiffs' claims and its own ability to address any harms they suffered. And while it's hard to say that the plaintiffs "unduly" delayed bringing their claims to court, it is fair to say that they waited a few days during a time when a few days made a meaningful difference.

But it's the final factor that's really the last nail in the coffin. Practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges. *Riley v. Kennedy*, 553 U.S. 406, 426 (2008). And this election is *already proceeding*. Early voting is underway and mail-in ballots have been distributed and returned. "The election is not merely 'close,' or even 'imminent'—it is happening right now." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 227 (4th Cir. 2024) (quoting *Purcell*, 549 U.S. at 5); *see also New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020).

So, what can the Court do at this point without running afoul of *Purcell*? Should completed ballots be discarded and replaced with new ones? "We would be hard pressed to think of a situation more confusing to a voter than receiving a second ballot with instructions to vote again." *Walen v. Burgum*, No. 1:22-

CV-31, 2022 WL 1688746, at *5 (D.N.D. May 26, 2022). Should the Court order publication of new ballots for those who haven't voted yet? Different ballots issued to otherwise similarly situated voters would pose different legal problems. *See West, slip op.* at 9-10 n.11. And that's assuming any of this is even feasible, for which the plaintiffs have made no showing.

Timing also matters because even if the Court could somehow cobble together effective relief before November 5, this case certainly won't result in a final judgment in their favor before then. And the burden on a movant for preliminary injunction is particularly heavy where granting the injunction will give the movant substantially the relief it would obtain after trial on the merits. *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998); *see also Noem v. Haaland*, 542 F. Supp. 3d 898, 911 (D.S.D. 2021). There is, as a practical matter, nothing "preliminary" about the injunction the plaintiffs are seeking—placing them on the 2024 general election ballot would give them everything they want.

### III. CONCLUSION

Taken together, the Court finds that the plaintiffs haven't made the showing required for a temporary restraining order or preliminary injunction. They are unlikely to succeed on the merits, the Court can do little to repair their alleged irreparable harm at this point, and anything the Court could do would cause far more harm than good.

The Court has carefully considered whether to simply deny a temporary restraining order, and wait for briefing on the plaintiffs' request for a preliminary injunction. But even an expedited briefing schedule would run right up to Election Day, and in the Court's view the outcome is already clear. Accordingly, the Court will deny the plaintiffs' motion in its entirety.

The Court has also considered whether this case is already moot. But as discussed above, the Court hasn't made a final determination about whether the plaintiffs' request for declaratory relief should proceed in this Court. And it's also entirely possible, given the tight timeline of Nebraska's election laws even if a plaintiff proceeded with alacrity, that these issues would be capable of repetition yet evading review. *See Storer*, 415 U.S. at 737 n.8. The Court will, therefore, at least await pleading from the defendants and appropriate motions before considering how and when to finally dispose of this case.

IT IS ORDERED that the plaintiffs' motion for preliminary injunctive relief (filing 10) is denied.

Dated this 17th day of October, 2024.

BY THE COURT:

John M. Gerrard
Senior United States District Judge